David L. Mortensen (#8242)
dmortensen@foley.com
Jordan C. Bledsoe (#15545)
jordan.bledsoe@foley.com
Brandon T. Christensen (#16420)
bchristensen@foley.com
FOLEY & LARDNER LLP
95 South State Street, Suite 2500
Salt Lake City, UT 84111
Telephone: 801.401.8921

*Attorneys for LSA Lab, LLC*

---

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH**

| | |
|---|---|
| MED AM INTERNATIONAL, LLC, a Utah limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>LSA LAB, LLC, a Nevada limited liability company,<br><br>Defendant. | **LSA LAB, LLC'S SECOND AMENDED COUNTERCLAIM**<br><br>Case No. 2:22-cv-00515-HCN-DBP<br><br>Judge Howard C. Nielson<br><br>Magistrate Judge Dustin B. Pead |

| | |
|---|---|
| LSA LAB, LLC, a Nevada limited liability company,<br><br>Counterclaimant,<br><br>v.<br><br>MED AM INTERNATIONAL, LLC, a Utah limited liability company; and MULTIPLAN, INC., a New York corporation,<br><br>Counterclaim Defendants. | |

Defendant and counterclaimant LSA Lab, LLC ("LSA"), through its counsel, states for its counterclaim against plaintiff and counterclaim defendant Med Am International, LLC dba Med USA ("Med USA") and against counterclaim defendant Multiplan, Inc. ("Multiplan") as follows:

**PARTIES**

1. LSA is a limited liability company organized under the laws of the State of Nevada. LSA's principal place of business is located at 3376 South Eastern Avenue, Suite 110, Las Vegas, Nevada 89169. LSA's members all reside in Nevada or California.

2. Med USA is a limited liability company organized under the laws of the State of Utah. Med USA's principal place of business located at 9825 South

500 West, Sandy, Utah 84070. On information and belief, Med USA's members all reside in Utah.

3. Multiplan is a corporation organized under the laws of the State of New York. On information and belief, Multiplan's principal place of business is located in New York City, New York.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties and LSA seeks damages in excess of $75,000, exclusive of interest and costs.

5. This Court has personal jurisdiction over Med USA because Med USA is a Utah limited liability company with its principal place of business in Utah and, on information and belief, all its members all reside in Utah.

6. This Court has general personal jurisdiction over Multiplan.

7. Multiplan conducts continuous business in Utah, including but not limited to offering PPO medical plans specific to Utah, contracting with Utah healthcare providers and institutions, and providing services to Utah companies, including the University of Utah Health Plan.

8. This Court also has specific personal jurisdiction over Multiplan.

9. A substantial portion of Multiplan's tortious and unlawful conduct described below occurred during and in connection with negotiations and other discussions between Multiplan and Med USA employees located in Utah. Indeed, the contracts that Multiplan conspired with Med USA to sign on LSA's behalf were signed by a Med USA employee located in Utah.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Med USA resides within this Judicial District, and because a substantial part of the events or omissions giving rise to LSA's claims occurred within this Judicial District.

11. LSA joins Multiplan to this action under Rule 20 of the Federal Rules of Civil Procedure.

## GENERAL ALLEGATIONS

### LSA's Business

12. LSA is an accredited clinical laboratory that specializes in reliable toxicology, hormone, and COVID-19 testing using some of the industry's most advanced technology and implementing best practices.

13. LSA typically provides services to customers with health insurance. A sizeable portion of LSA's business involves submitting, negotiating, and processing claims for payment from insurers.

14. LSA has relationships with many health insurance providers and negotiates rates and payments with those providers. Due to the significant volume of LSA's claims, LSA also works with revenue-cycle management companies, insurance brokers, and other third parties that represent LSA's interests in reviewing, processing, and negotiating payments from insurers.

**LSA and Med USA Enter into Services Agreements**

15. On March 30, 2021, LSA and Med USA entered into a Master Services Agreement (the "First MSA") whereby Med USA agreed to provide LSA with practice management, billing management, bill collection, and other related services and software (the "Services"). In particular, Med USA agreed to manage and process insurance claims and payments for LSA relating to LSA's testing.

16. On December 1, 2021, LSA and Med USA entered into a second Master Services Agreement (the "Second MSA") that was substantively identical to the First MSA except for reduced rates paid to Med USA. The First MSA and Second MSA together are the "MSAs." The Second MSA expressly superseded the First MSA. Second MSA § 35(h).

17. Under the Second MSA, Med USA was required to, among other things, file insurance claims, follow up on insurance claims, pursue collection and payment of accounts receivable, receive payment from insurers and patients, enter

payment details into a database, deposit payments into the applicable bank account, and advise LSA on refundable amounts due. *Id.* § 2.

**Multiplan's Business**

18. Multiplan is a service provider that negotiates and processes claims for insurance companies and other payors, referred to herein as payors.

19. Multiplan represents hundreds of payors, including many of the biggest insurance companies in the country.

20. In a typical case relevant to this matter, LSA would provide a service to a patient and then send the claim for that service to the patient's payor. The payor would then forward the claim to Multiplan.

21. Multiplan would then negotiate with LSA to determine what amount LSA would accept as payment for that service. Multiplan would then tell the payor what LSA had agreed to accept as payment for that service.

22. Multiplan's goal is to save the payors as much money as possible by negotiating lower rates for each claim and then providing that information to the payor. The payor will then make payments to the provider based on the information provided by Multiplan.

23. On information and belief, payors generally have a maximum allowable amount that they are willing to pay for certain services.

24. Multiplan would negotiate with the provider for the provider to accept payment at a rate lower than the payor's maximum allowable.

25. Multiplan tracked how much it was able to save a payor on claims compared to the amount that was billed for the claim.

26. Multiplan employees' compensation and/or bonuses are based at least in part on the reduction in payment to providers that they are able to achieve.

27. On information and belief, payors were often willing to pay the full amount billed by providers for COVID-19 testing services.

28. For non-COVID-19 services, payors would receive the negotiated payment information from Multiplan and then make further determinations about how much the payor was going to pay a provider based on, for example, coverage, co-pays, deductibles, or other details of the individual plans.

29. As relevant here, LSA provided COVID-19 testing to patients. The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") required payors to cover COVID-19 testing and to not apportion any monetary responsibility to the patient. *See* CARES Act § 4201.

30. On information and belief, payors paid LSA the amount that Multiplan told the payors LSA had agreed to accept.

31. On information and belief, Multiplan received greater profits based on the amounts it was able to save its payor-clients by negotiating lower rates with providers.

**Multiplan Investigated for Its Business Practices**

32. Unfortunately, Multiplan's business model, in which it makes more money if payors cover a smaller amount of a patients' medical expenses, leads to perverse incentives.

33. Multiplan employees are incentivized to push the boundaries to achieve further reductions in payments to providers.

34. Indeed, Multiplan has come under fire from various investigative journalists, policy makers, academic experts, and industry groups, among others, for its business practices.

35. For example, The New York Times recently published several detailed and lengthy investigative reports describing Multiplan's "large and mostly hidden financial incentive" to cut payment to providers.

36. The New York Times reported that former Multiplan employees describe a numbers-driven culture that encouraged locking in unreasonably low payments and that tied employee's bonuses to their success at reducing payments

to providers. Further, Multiplan's profit on a per claim basis could be more than the provider receives for that claim.

37. The New York Times also reported that "documents and interviews revealed tactics meant to pressure medical practices to accept low payments. Some offers came with all-caps admonitions and deadlines just hours away. Accept and receive prompt payment; refuse and risk an even lower payout. Practices and billing specialists said this often wasn't an empty threat."

38. These questionable practices led to Multiplan recommending insurers not make nearly $23 billion in payments to providers last year and to Multiplan having annual revenues of about $1 billion.

39. Senator Amy Klobuchar asked federal regulators to investigate Multiplan's practices that drive down payments to providers.

40. A leading law professor stated that there seems to be a strong case against Multiplan and that there should be investigations.

41. The American Hospital Association published a letter to Labor Department Acting Secretary Su, asking the department to investigate Multiplan, and describing the harm being done to patients and providers by Multiplan's secretive practices and perverse incentives.

42. Multiplan is also currently facing several high-profile lawsuits alleging various unlawful business practices and substantial economic losses to providers.

**Med USA Begins Negotiating Claims on Behalf of LSA**

43. After entering into the MSA in March 2021, Med USA began negotiating claims on LSA's behalf.

44. If a payor was represented by Multiplan, the negotiation would occur between Med USA on behalf of LSA and Multiplan on behalf of the payor.

45. Each claim was negotiated individually.

46. Multiplan knew that Med USA was a third-party service provider for LSA, and not a part of LSA.

**LSA Elects Not to Enter into a GRA with MultiPlan**

47. In September 2021, Multiplan approached LSA directly about entering into an agreement regarding rates for the services LSA provided. These types of agreements are called by a variety of names in the industry and are referred to herein as a global rate agreement ("GRA").

48. In general, a GRA is a contract with the provider that identifies the amount that the provider will generally accept as payment for certain services across all claims.

49. In the negotiations between Multiplan and LSA, LSA told Multiplan that it would only agree to a GRA if the agreed upon rates were at least 60% of LSA's billed charges.

50. Those negotiations stalled.

51. LSA informed Med USA that it was unable to reach an agreement with MultiPlan regarding the terms of a GRA.

**Med USA Fraudulently Executes a GRA with MultiPlan Purportedly on LSA's Behalf Without LSA's Knowledge, Consent, or Authority**

52. Unbeknownst to LSA, in December 2021, Med USA surreptitiously negotiated and executed a GRA with MultiPlan (the "First GRA") purportedly on LSA's behalf that set a minimum payment rate well below the standard amount that LSA would accept.

53. LSA did not know at the time that Med USA had negotiated and executed the First GRA with MultiPlan purportedly on LSA's behalf. Further, LSA never consented to any GRA with MultiPlan, never authorized Med USA to negotiate or enter into any agreements with MultiPlan on its behalf, and never authorized Med USA to negotiate or enter into the First GRA.

54. The First GRA came about as follows: In December 2021, after negotiations between Multiplan and LSA had stalled, Multiplan sent a draft GRA to a Med USA employee instead.

55. That Med USA employee reiterated that LSA required the payment rate in the GRA to be at least 60% of billed charges.

56. A few days later, Multiplan tried again by sending another draft GRA to a different Med USA employee, Sarah Hathenbruck.

57. The draft GRA Multiplan sent to Sarah Hathenbruck proposed rates below the 60% required by LSA.

58. Hathenbruck told Multiplan that LSA's CFO, Michael McConnell, needed to approve a GRA.

59. Multiplan knew and understood that Mr. McConnell would be the one to approve and sign the GRA.

60. However, on December 27, 2021, Hathenbruck signed the GRA and returned it to Multiplan (the "First GRA").

61. Med USA falsely represented in the First GRA that LSA had agreed to the terms of the First GRA:

MultiPlan

To: Sarah Hathenbruck
Email: shathenbruck@medusarcm.com
From: Vanessa Garza
Date: December 16, 2021

**MULTIPLAN NEGOTIATION SERVICES**
**Global Rate Agreement**

. LSA Lab LLC agrees to the following terms and conditions effective December 16, 2021:

62. Med USA also falsely represented in the First GRA that LSA had authorized the signatory to the First GRA to sign on behalf of LSA:

> The signatory to this Global Agreement represents and warrants that he/she is signing on behalf of the Provider or Provider Group and is fully authorized to sign and commit Provider to all its obligations and responsibilities under this Global Agreement.
>
> 12/27/21 Sarah B Hathenbruck, RCM Mgr.
>
> Authorized Representatives Signature / Date Print Name / Title

63. Med USA's representations to MultiPlan that it had authority to negotiate on LSA's behalf, that LSA had agreed to the terms of the First GRA, and that Med USA had authority to sign agreements on LSA's behalf were false. Med USA did not have authority to negotiate and enter into the First GRA on LSA's behalf.

64. On information and belief, Med USA knew that it did not have LSA's authority or consent to negotiate and enter into the First GRA, and it knew LSA did not know that Med USA had negotiated and executed the First GRA.

65. Multiplan knew or should have known that Hathenbruck did not have authority to execute the First GRA, that LSA had not agreed to the rates therein, and that the GRA was therefore ineffective.

66. Multiplan did not inform anyone at LSA about the First GRA or that Hathenbruck had signed on behalf of LSA.

67. Despite this knowledge, Multiplan began processing LSA's claims under the First GRA.

68. If a claim fell within the scope of the GRA, Multiplan would never send or otherwise discuss the claim with Med USA or LSA.

69. Instead, it would send the claim right back to the payor.

70. On information and belief, Multiplan falsely told the payors that LSA had agreed to accept a lower rate from the GRA as payment for the service.

71. The payors in turn paid LSA the lower rates.

72. Multiplan knew that it did not have a valid GRA with LSA regarding the rates.

**The Rates in the First GRA**

73. LSA generally billed for five services. Those services are billed based on "Current Procedural Terminology codes" or "CPT" codes.

74. During the relevant time period, LSA billed the following for the five CPT codes:

| Code | Billed Amount |
|---|---|
| CPT 87426 | $135.69 |
| CPT G2023 | $70.38 |
| CPT 87811 | $124.14 |
| CPT U0004 | $225.00 |
| CPT U0005 | $75.00 |

75. The First GRA that Multiplan induced Hathenbruck to sign listed the amounts that LSA would allegedly accept for each CPT code. The First GRA included the following table:

| Code(s) | Billed Charge(s) | Code Rate |
|---|---|---|
| CPT 87426 | $135.69 | $67.50 |
| CPT G2023 | $70.38 | $35.19 |
| CPT 87811 | $124.14 | $62.07 |
| CPT U0004 | $225.00 | $112.50 |
| CPT U0005 | $75.00 | $37.50 |

76. The rates in the First GRA represented a 50% discount off of LSA's billed rates.

77. The First GRA also provided that LSA would accept payment for non-covid services at a 60% discount, or 40% of billed rates.

78. LSA would never have agreed to these amounts.

79. Indeed, Multiplan knew from its previous conversations with LSA and Med USA that LSA would not accept lower than 60% of the billed amount.

**Med USA Fraudulently Executes a Second GRA with MultiPlan Purportedly on LSA's Behalf Without LSA's Knowledge, Consent, or Authority**

80. In March 2022, Multiplan again contacted Hathenbruck, wanting a new GRA with even lower rates.

81. This time, Multiplan did not even ask if LSA had approved it, and instead just directed Hathenbruck to sign the GRA.

82. On information and belief, Multiplan pressured Hathenbruck to sign the new agreement so that Multiplan could increase its profits.

83. Multiplan benefited from the fraudulent GRA because it saved money for its clients, which in turn increased profits for Multiplan.

84. Med USA executed a modified GRA (the "Second GRA") that amended the First GRA to set a new minimum payment of only 22% of LSA's billed charges.

85. Again, LSA did not know at the time that Med USA had negotiated and executed the Second GRA with MultiPlan purportedly on LSA's behalf. Further, LSA never authorized Med USA to negotiate or enter into the Second GRA and never consented to the Second GRA.

86. Like in the First GRA, Med USA falsely represented in the Second GRA that LSA had agreed to the terms of the Second GRA, when LSA had not:

MultiPlan

To: Sarah Hathenbruck
Email: shathenbruck@medusarcm.com
From: Vanessa Garza
Date: March 15, 2022

**MULTIPLAN NEGOTIATION SERVICES**
**Global Rate Agreement**

. LSA Lab LLC agrees to the following terms and conditions effective March 15, 2022:

87. And Med USA once more falsely represented that LSA had authorized the signatory to the Second GRA to sign on behalf of LSA, when LSA had not:

> The signatory to this Global Agreement represents and warrants that he/she is signing on behalf of the Provider or Provider Group and is fully authorized to sign and commit Provider to all its obligations and responsibilities under this Global Agreement.
>
> 3/15/2022 Sarah Hathenbruck, RCM Mgr
>
> Authorized Representatives Signature / Date Print Name / Title

88. The individual who signed the First GRA and Second GRA, Sarah Hathenbruck, is an employee of Med USA.

89. Multiplan knew or should have known that Hathenbruck did not have authority to execute a contract on behalf of LSA.

90. Multiplan again did not inform anyone at LSA about the Second GRA, that Hathenbruck had signed the GRA, or that Multiplan was processing claims based on the fraudulent GRA.

91. Multiplan continued to process LSA's claims under the Second GRA.

92. Multiplan had no basis to believe that Med USA had authority to sign the First and Second GRAs.

**<u>The Rates in the Second GRA</u>**

93. The Second GRA listed the following rates:

| Code(s) | Billed Charge(s) | Code Rate |
|---|---|---|
| CPT 87426 | $135.69 | $30.00 |
| CPT G2023 | $70.38 | $35.19 |
| CPT 87811 | $124.14 | $62.07 |
| CPT U0004 | $225.00 | $112.50 |
| CPT U0005 | $75.00 | $24.50 |

94. Thus, the rate listed in the Second GRA was about 22% of the billed rate for CPT 87426 and about 33% for CPT U0005.

**Med USA Surreptitiously Enters into the First GRA and Second GRA to Avoid Processing Individual Claims**

95. On information and belief, Med USA negotiated and executed the First GRA and Second GRA (together, the "MultiPlan GRAs" or "GRAs") with MultiPlan purportedly on LSA's behalf and without LSA's authorization to avoid the added time and expense Med USA would incur in reviewing and processing claims.

96. A claim processor like Med USA is required to review each individual reimbursement claim submitted by an insurer if there is not a GRA governing the amount of reimbursement owed to a testing company like LSA.

97. Similarly, Med USA is required to review individual reimbursement claims that do not meet the minimum requirement set by LSA in a given GRA. For example, if a GRA between LSA and an insurer required that the insurer pay a certain percentage of LSA's billed charges, Med USA would be required to review and negotiate any individual claim that proposed to pay less than that percentage.

98. As such, without a GRA in place between LSA and an insurer, Med USA was required to review, and negotiate as necessary, each individual claim submitted by an insurer to ensure it satisfied LSA's requirements. A higher minimum rate in a GRA between LSA and insurer generally required more processing by Med USA and resulted in higher payments to LSA.

99. Under the Second MSA, Med USA was required to process individual claims where there was no GRA in place between LSA and an insurer.

100. On information and belief, Med USA did not have sufficient personnel to handle LSA's claims and thus fraudulently entered into the MultiPlan GRAs to avoid reviewing individual claims submitted by MultiPlan on behalf of insurers.

101. Both Med USA and Multiplan benefited financially from the GRAs. Med USA was able to process more claims with less work. Multiplan was likewise able to process more claims with less work and create more savings for their clients, which led to more profits for Multiplan.

**<u>Multiplan Conceals its Conduct</u>**

102. Despite obtaining fraudulent agreements through Hathenbruck without informing LSA, Multiplan continued to negotiate directly with LSA as if no agreements existed.

103. On February 22, 2022, Multiplan, through its employee Jessica Miguel, sent an email directly to LSA "following up" on the negotiations that had stalled in the fall of 2021.

104. Multiplan knew Hathenbruck had signed the First GRA and that it was processing claims for LSA under that GRA.

105. In response to the email, LSA reiterated that the rates needed to be above 60% of the billed rates.

106. Multiplan knew that at the time an agreement (the First GRA) was fraudulently in place for rates less than 60%.

107. On February 28, 2022, Multiplan, through Miguel, stated that it would review again and perform analysis to determine if it could agree to 60%.

108. In March 2022, while it induced Hathenbruck to fraudulently sign the Second GRA with even lower rates, Multiplan continued to feign negotiations with LSA directly.

109. During these negotiations, on March 24, 2022, Multiplan, through Miguel, sent LSA a list of the "current billed charges with the allowed amount by CPT code." Multiplan did not disclose, however, that some of the current rates were actually lower because of the GRAs that were fraudulently entered into by Med USA and Multiplan.

110. Multiplan knew or should have known that its continued negotiations with LSA were misleading, that its statements did not contain the whole truth, and that without further explanation, its statements would give LSA a false belief as to the facts of the parties' relationship.

111. LSA relied on Multiplan's misrepresentations and omissions by not questioning the payments it was receiving.

112. Multiplan processed more than 24,000 claims from LSA under the fraudulent First and Second GRAs.

113. Based on Multiplan's misrepresentations, Multiplan's payor-clients only paid LSA the amounts listed in the fraudulent First and Second GRAs on more than 24,000 occasions.

114. Most of those claims, if not all, were for multiple services.

115. On information and belief, many if not all the payors who paid LSA under the GRAs would have paid more if Multiplan had not falsely told them that LSA would accept the lower amounts in the fraudulent First and Second GRAs.

116. Because of the fraudulent GRAs and Multiplan's conduct, LSA was paid less than it would have been, and suffered millions of dollars in damages.

**LSA Discovers Med USA's Misconduct**

117. In or around March 2022, LSA began to suspect that Med USA had engaged in misconduct because LSA began receiving less than was customary for certain reimbursement claims.

118. By April 2022, LSA discovered that Med USA had entered into the First GRA. And by May 2022, LSA discovered that Med USA had entered into the Second GRA.

119. On or around May 4, 2022, LSA instructed Med USA to inform MultiPlan that Med USA had fraudulently entered into the Multiplan GRAs without LSA's knowledge, consent, or authorization and to terminate the MultiPlan GRAs.

120. Based on information from Med USA, as of May 4, 2022, Med USA processed approximately 15,053 claims from the insurers MultiPlan represented. Med USA approved those claims pursuant to the rates set forth in the First GRA or Second GRA, which were significantly less than LSA would have agreed to accept. As a result, LSA estimates that it has suffered in excess of $2 million in damages, plus interest, costs, and attorneys' fees.

121. Despite LSA's instructions, Med USA failed to correct its misconduct and failed to pay LSA for the damages it had suffered because Med USA entered into the MultiPlan GRAs without LSA's knowledge, consent, or authorization.

**LSA Informs Med USA That Its Damages Exceed Med USA's Invoices**

122. Because Med USA refused to accept responsibility for its misconduct, on May 27, 2022, counsel for LSA sent a letter addressing Med USA's fraudulent conduct.

123. The letter explained, among other things, that LSA had refused to pay, and would continue to refuse to pay, Med USA's invoices because the damages caused by Med USA's fraudulent conduct far exceeded the amounts Med USA invoiced to LSA under the Second MSA.

124. To date, Med USA has failed to take responsibility for its actions or compensate LSA for the damages caused by Med USA's misconduct.

**Med USA Incorrectly Codes Medicare/Medicaid Claims**

125. In May and June of 2022, Med USA inputted incorrect information into various claims on behalf of LSA for payment from Medicare and Medicaid.

126. In particular, Med USA inputted the incorrect National Provider Identifier ("NPI") address in these claims, which delayed payment from Medicare and Medicaid to LSA.

127. As a result, LSA estimates it has failed to receive approximately $100,000 in payments owed from Medicare and Medicaid.

128. On information and belief, Med USA has the ability obtain these delayed payments from Medicare and Medicaid for LSA, but it has failed and refused to do so.

129. LSA has incurred significant expenses attempting to recover these payments without Med USA's cooperation, but it has been unsuccessful.

**Med USA Fails to Provide LSA with Its Accounts Receivable**

130. The Second MSA terminated because Med USA refused to cure its breaches of the Second MSA within 60 days of LSA's first notice, which it provided on or around April 26, 2022. Med USA stopped providing services under the Second MSA on June 6, 2022.

131. Upon termination of the Second MSA, Med USA was required to "deliver to [LSA] an electronic copy of all Accounts Receivable…setting forth debit and credit balances, in an industry standard electronic format[.]" Terms and Conditions § 33(b).

132. Despite LSA's demands, Med USA has failed to provide LSA with an electronic copy of LSA's accounts receivable. Med USA has also locked LSA out of its systems so that LSA cannot access this critical data.

133. Med USA is effectively holding hostage a copy of LSA's accounts receivable to extract payment of Med USA's outstanding invoices, even though the amount of LSA's damages far exceed the amounts of the invoices.

134. LSA requires a copy of its accounts receivable to provide to its new claims processor that replaced Med USA, with the information necessary to review and process outstanding payments from insurers.

135. LSA estimates that it has tens of millions of dollars in outstanding accounts receivable that Med USA is preventing LSA from collecting by improperly refusing to provide a copy of LSA's accounts receivable.

## FIRST CAUSE OF ACTION
**(Breach of Contract – Against Med USA)**

136. LSA restates and incorporates by reference each of the allegations set forth in the paragraphs above as though fully set forth herein.

137. The Second MSA is a binding and enforceable contract between LSA and Med USA.

138. LSA performed its obligations under the Second MSA or was excused from performing its obligations due to Med USA's preceding misconduct and breach.

139. Med USA breached the Second MSA by (a) mishandling LSA's claims for payment from Medicare and Medicaid; (b) failing to provide to LSA an

electronic copy of its accounts receivable, (c) failing to return LSA's data or provide access to that data after the Second MSA's termination, (d) failing to review, process, and negotiate all claims submitted by insurers, (e) failing to negotiate in LSA's best interests, including without limitation negotiating reduced payments to reduce Med USA's costs and accepting payments below LSA's established thresholds, (f) negotiating and signing the GRAs with MultiPlan without LSA's knowledge, authorization, or consent to do so, (g) providing LSA inaccurate information about the payment amounts offered by the insurers MultiPlan represented, (h) failing to notify and concealing from LSA that Med USA had entered into the GRAs with MultiPlan on LSA's behalf in December 2021 and March 2022, (i) undermining LSA's efforts to negotiate directly with MultiPlan, and (j) otherwise failing to provide the contractual services in a professional manner. *See* Second MSA § 2; Terms and Conditions §§ 5, 27, 33(b).

140. As a direct and proximate result of Med USA's conduct, LSA has been damaged and is continuing to be damaged in an amount to be determined at trial.

141. In addition, LSA is entitled to its reasonable attorneys' fees, costs, and expenses of litigation pursuant to Section 35(b) of the Terms and Conditions.

142. The Court should further order that Med USA is required to immediately return the required data regarding LSA's accounts receivable.

**SECOND CAUSE OF ACTION**
**(Breach of Implied Covenant of Good Faith and Fair Dealing – Against Med USA)**

143. LSA restates and incorporates by reference each of the allegations set forth in the paragraphs above as though fully set forth herein.

144. The Second MSA is a binding and enforceable contract between LSA and Med USA.

145. Under Utah law, there is an implied covenant of good faith and fair dealing implied in the Second MSA whereby Med USA covenanted that it would not do anything that would have the effect of destroying or injuring LSA's right to receive the benefits of the Second MSA.

146. LSA performed its obligations under the Second MSA or was excused from performing its obligations due to Med USA's preceding misconduct.

147. Med USA breached the implied covenant of good faith and fair dealing by (a) mishandling LSA's claims for payment from Medicare and Medicaid; (b) failing to provide to LSA an electronic copy of its accounts receivable, (c) failing to return LSA's data or provide access to that data after the Second MSA's termination, (d) failing to review, process, and negotiate all claims

submitted by insurers, (e) failing to negotiate in LSA's best interests, including without limitation negotiating reduced payments to reduce Med USA's costs and accepting payments below LSA's established thresholds, (f) negotiating and signing the GRAs with MultiPlan without LSA's knowledge, authorization, or consent to do so, (g) providing LSA inaccurate information about the payment amounts offered by the insurers MultiPlan represented, (h) failing to notify and concealing from LSA that Med USA had entered into the GRAs with MultiPlan on LSA's behalf in December 2021 and March 2022, (i) undermining LSA's efforts to negotiate directly with MultiPlan, and (j) otherwise failing to provide the contractual services in a professional manner.

148. As a direct and proximate result of Med USA's conduct, LSA has been damaged and is continuing to be damaged in an amount to be determined at trial.

149. In addition, LSA is entitled to its reasonable attorneys' fees, costs, and expenses of litigation pursuant to Section 35(b) of the Terms and Conditions.

150. The Court should further order that Med USA is required to immediately return the required data regarding LSA's accounts receivable.

## THIRD CAUSE OF ACTION
## (Conversion – In the Alternative – Against Med USA)

151. LSA restates and incorporates by reference each of the allegations set forth in the paragraphs above as though fully set forth herein.

152. LSA's accounts receivable are LSA's property. LSA thus has a legal right to a copy of its accounts receivable, which are currently in Med USA's possession. LSA does not have a copy of its accounts receivable.

153. LSA entrusted Med USA to use and maintain LSA's accounts receivable. To the extent the terminated Second MSA does not require Med USA return to LSA its accounts receivable, Med USA has converted LSA's accounts receivable by retaining the accounts receivable and refusing to provide LSA with its accounts receivable.

154. Med USA's retention of LSA's accounts receivable and refusing to provide LSA with its accounts receivable is inconsistent with LSA's property rights.

155. As a direct and proximate result of Med USA's conduct, LSA has been damaged and is continuing to be damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
**(Fraud – Against Multiplan)**

156. LSA restates and incorporates by reference each of the allegations set forth in the paragraphs above as though fully set forth herein.

157. In emails and other conversations between Miguel at Multiplan and LSA, between February 2022 and May 2022, Multiplan made fraudulent misrepresentations in alleged negotiations with LSA as well as statements that Multiplan knew or should have known were misleading to LSA because additional or clarifying information regarding the GRAs was not included.

158. The misrepresentations and materially misleading statements include, but are not limited to, that Multiplan wanted to negotiate a rate agreement and that the current billed rates with allowed amounts were higher than the GRA rates.

159. LSA did not know that the GRAs had been fraudulently executed or that Multiplan was processing claims under the GRAs.

160. By its false and misleading statements, Multiplan intended that LSA not find out that the GRAs were already in place and continue to accept the payments made by payors at lower rates.

161. LSA relied on these false and misleading statements by continuing to negotiate with Multiplan and accepting payments from payors when the payment amounts had not been agreed to.

162. As a direct and proximate result of Multiplan's conduct, LSA has been damaged and is continuing to be damaged in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(Tortious Interference – Against Multiplan)**

163. LSA restates and incorporates by reference each of the allegations set forth in the paragraphs above as though fully set forth herein.

164. Multiplan tortiously interfered with LSA's economic relations.

165. LSA had existing and potential economic relations with the patients it provided services to and those patients' insurers who were represented by Multiplan in that LSA provided services to patients with the expectation to be paid by the payors for the services. And the payors had promised and were required to pay LSA for those services.

166. LSA also had existing economic relations with Med USA.

167. Multiplan intentionally interfered with those relationships by improper means by misrepresenting to payors and LSA that LSA had agreed to the rates in the GRAs.

168. Multiplan also intentionally interfered with those relationships by improper means by concealing its actions from LSA and finding a Med USA employee to fraudulently sign the GRAs when Multiplan knew that LSA had to approve the GRAs.

169. As a direct and proximate result of Multiplan's conduct, LSA has been damaged and is continuing to be damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
## (Fraudulent Non-disclosure – Against Multiplan)

170. LSA restates and incorporates by reference each of the allegations set forth in the paragraphs above as though fully set forth herein.

171. Multiplan owed LSA a duty to disclose the GRAs and/or that it was processing claims under the GRAs by virtue of the special relationship between LSA and Multiplan.

172. This special relationship arises because, among other things, Multiplan purported to be in contractual privity with LSA; Multiplan had access to material information regarding LSA, Med USA, and Med USA's actions that LSA did not have; there was a disparity in knowledge between Multiplan and LSA; Multiplan continued to transact business with Med USA on LSA's behalf; and Multiplan continued to negotiate with LSA.

173. Multiplan further owed LSA a duty to disclose the GRAs and/or that it was processing claims under the GRAs because Multiplan knew the knowledge of these facts was necessary to prevent Multiplan's partial or ambiguous statements from being misleading

174. Multiplan further owed LSA a duty to disclose the GRAs and/or that it was processing claims under the GRAs because Multiplan knew LSA was mistaken about these facts and was going to rely on that mistake.

175. Multiplan knew but failed to disclose that the GRAs existed, that Hathenbruck had signed GRAs, and that Multiplan was processing claims under the GRAs.

176. This information was material to LSA because LSA would have acted differently if it had known the truth, including but not limited to by not accepting payments from payors at the lower rates and firing Med USA.

177. As a direct and proximate result of Multiplan's conduct, LSA has been damaged and is continuing to be damaged in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
## (Aiding and Abetting Breach of Fiduciary Duty – Against Multiplan)

178. LSA restates and incorporates by reference each of the allegations set forth in the paragraphs above as though fully set forth herein.

179. Multiplan knew that LSA had engaged Med USA to process individual claims on LSA's behalf and that therefore Med USA owed fiduciary duties to LSA.

180. Multiplan knew or should have known that Hathenbruck did not have authority to sign the GRAs on LSA's behalf.

181. By signing the GRAs, Med USA breached its fiduciary duty to LSA.

182. Multiplan knew that by signing the GRAs, Med USA breached its fiduciary duty to LSA.

183. Multiplan participated or joined Med USA in its breaches by, among other things, communicating only with Med USA about the GRAs, encouraging, pressuring, and inducing Med USA to sign the GRAs, not disclosing the GRAs to LSA, and processing claims under the GRAs while knowing LSA had not agreed to the terms of the GRAs.

184. Multiplan aided and abetted Med USA's breach of fiduciary duty.

185. As a direct and proximate result of Multiplan's conduct, LSA has been damaged and is continuing to be damaged in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
## (Communication Fraud – Utah Code §§ 78B-6-1701, 76-10-1801 – Against Multiplan)

186. LSA restates and incorporates by reference each of the allegations set forth in the paragraphs above as though fully set forth herein.

187. Multiplan devised a scheme or artifice to defraud LSA and to obtain more profit and/or business from its payor-clients by false or fraudulent pretenses, representations, and material omissions.

188. The false and fraudulent pretenses, representations, and material omissions are described above.

189. Multiplan communicated with LSA, Med USA, and payors, among others, for the purpose of executing or concealing the scheme or artifice.

190. Multiplan therefore is in violation of Utah Code § 76-10-1801, having committed communications fraud.

191. As a direct and proximate result of Multiplan's conduct, LSA has been damaged and is continuing to be damaged in an amount to be determined at trial.

192. Pursuant to Utah Code § 78B-6-1701, LSA is entitled to compensatory damages up to three times the amount of actual damages, attorney fees, and court costs.

193. LSA is also entitled to punitive damages in addition to compensatory damages.

**NINTH CAUSE OF ACTION**
**(Unjust Enrichment – Against Multiplan)**

194. LSA restates and incorporates by reference each of the allegations set forth in the paragraphs above as though fully set forth herein.

195. On information and belief, Multiplan received profits and/ additional business corresponding to the amount of money it saved its payor-clients by negotiating lower rates for payments to providers.

196. For claims processed under the GRAs, Multiplan received a benefit based on the lower rates paid to LSA.

197. Multiplan only received this benefit because it improperly processed claims under the GRAs.

198. Without Multiplan's improper conduct, LSA would have received a greater benefit from Multiplan's payor-clients.

199. It would be unjust for Multiplan to retain this benefit at LSA's expense.

200. As a direct and proximate result of Multiplan's conduct, LSA has been damaged and is continuing to be damaged in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**
**(In the Alternative – Negligent Misrepresentation – Against Multiplan)**

201. LSA restates and incorporates by reference each of the allegations set forth in the paragraphs above as though fully set forth herein.

202. To the extent Multiplan did not act fraudulently in making the misrepresentations described above, Multiplan made the misrepresentations in a careless or negligent manner.

203. Multiplan owed LSA a duty to not make misrepresentations.

204. Among other things, Multiplan negligently stated in the claim data that the rates had been agreed to by LSA and negligently made misleading statements while negotiating directly with LSA which caused LSA to believe there were no agreements in place.

205. Multiplan made these negligent misrepresentations, expecting LSA to rely and act thereon, because Multiplan knew LSA relied on the claim data to ensure payment for its services and because Multiplan knew LSA did not know about the GRAs.

206. LSA relied on these misrepresentations by accepting lower payment from payors, continuing to negotiate with Multiplan, and not firing Med USA.

207. As a direct and proximate result of Multiplan's conduct, LSA has been damaged and is continuing to be damaged in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
**(In the Alternative – Negligent Non-disclosure – Against Multiplan)**

208. LSA restates and incorporates by reference each of the allegations set forth in the paragraphs above as though fully set forth herein.

209. Multiplan owed LSA a duty to disclose the GRAs and/or that it was processing claims under the GRAs by virtue of the special relationship between LSA and Multiplan.

210. This special relationship arises because, among other things, Multiplan purported to be in contractual privity with LSA; Multiplan had access to material information regarding LSA, Med USA, and Med USA's actions that LSA did not have; there was a disparity in knowledge between Multiplan and LSA; Multiplan continued to transact business with Med USA on LSA's behalf; and Multiplan continued to negotiate with LSA.

211. Multiplan further owed LSA a duty to disclose the GRAs and/or that it was processing claims under the GRAs because Multiplan knew the knowledge of these facts was necessary to prevent Multiplan's partial or ambiguous statements from being misleading

212. Multiplan further owed LSA a duty to disclose the GRAs and/or that it was processing claims under the GRAs because Multiplan knew LSA was mistaken about these facts and was going to rely on that mistake.

213. Multiplan knew, but failed to disclose, that the GRAs existed, that Hathenbruck had signed GRAs, and that Multiplan was processing claims under the GRAs.

214. This information was material to LSA because LSA would have acted differently if it had known the truth, including but not limited to by not accepting payments from payors at the lower rates and firing Med USA.

215. As a direct and proximate result of Multiplan's conduct, LSA has been damaged and is continuing to be damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, LSA prays for an order against Med USA and Multiplan as follows:

A. On the First and Second Causes of Action:

1. For general compensatory damages in an amount to be proven at trial;
2. For attorneys' fees, costs, and expenses of litigation pursuant to Section 35(b) of the Terms and Conditions;
3. For pre- and post-judgment interest as allowed by applicable law; and

4. For such other and further relief as the Court deems just and proper.

B. On the Third Cause of Action:

1. For general compensatory damages in an amount to be proven at trial;
2. For pre- and post-judgment interest as allowed by applicable law; and
3. For such other and further relief as the Court deems just and proper.

C. On the Fourth through Eleventh Causes of Action:

1. For general compensatory damages in an amount to be proven at trial;
2. For attorneys' fees, costs, and expenses of litigation;
3. For pre- and post-judgment interest as allowed by applicable law;
4. For punitive damages as allowed by applicable law;
5. For such other and further relief as the Court deems just and proper.

D. On the Eighth Cause of Action:

1. For general compensatory damages in an amount to be proven at trial;
2. For treble damages, attorneys' fees, and court costs pursuant to Utah Code § 78B-6-1701(1); and
3. For punitive damages pursuant to Utah Code § 78B-6-1701(3);
4. For pre- and post-judgment interest as allowed by applicable law; and
5. For such other and further relief as the Court deems just and proper.

DATED: June 13, 2025

FOLEY & LARDNER LLP

*<u>/s/ Jordan C. Bledsoe</u>*
David L. Mortensen
Jordan C. Bledsoe
Brandon T. Christensen

*Attorneys for LSA Lab, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of June 2025, a true and correct copy of the foregoing **LSA LAB, LLC'S SECOND AMENDED COUNTERCLAIM** was served on the following via CM/ECF filing:

Joseph G. Pia
joe.pia@piahoyt.com
Jacob B. Stone
jstone@piahoyt.com
PIA HOYT, LLC
136 East South Temple, Suite 1900
Salt Lake City, Utah 84111

*Attorneys for Med Am International, LLC*

*/s/ Rose Gledhill*